Filed 3/10/14  P. v. Nasser CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KAMAL KENNY NASSER et al.,<br><br>    Defendants and Appellants. | F066645/F066646<br><br>(Super. Ct. Nos. CV-276603 & CV-276962)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  William D. Palmer, Judge.

Dowling Aaron, Daniel K. Klingenberger, Lynne Thaxter Brown and Stephanie Hamilton Borchers for Defendants and Appellants.

Lisa S. Green, District Attorney, and Gregory A. Pulskamp, Deputy District Attorney, for Plaintiff and Respondent.

-ooOoo-

Kamal Kenny Nasser and Ghassan Elmalih (together defendants) each own and operate Internet café[1] businesses that feature a sweepstakes whereby customers may ascertain their winnings, if any, by playing computer game programs on terminals provided at defendants' business premises. Although the games played on defendants' terminals simulate the look and feel of slot machines or other games of chance, defendants maintain that the programs are merely an entertaining way for customers to reveal sweepstakes results. Further, according to defendants, the sweepstakes are a legitimate means to promote the sale of certain products—namely, telephone cards. The People of the State of California by and through the Kern County District Attorney (the People) filed civil actions under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), seeking injunctive relief on the ground that defendants' sweepstakes practices violated the gambling prohibitions set forth at Penal Code sections 319 (unlawful lottery) and 330a, 330b and 330.1 (unlawful slot machines or gambling devices).[2] After the complaints were filed, the trial court heard and granted the People's motions for preliminary injunctions. Defendants appeal from the orders granting such provisional relief.[3] Because we conclude the People will likely prevail on the claims that defendants

---

[1] Broadly speaking, the term "Internet café" depicts a café or similar establishment that sells computer use and/or Internet access on its premises. As commentators have pointed out, many such businesses now promote the sale of their products (e.g., computer time, Internet access or telephone cards) by offering a sweepstakes giveaway such as the ones offered here. (See e.g., Dunbar & Russell, *The History of Internet Cafes and the Current Approach to Their Regulation* (2012) 3 UNLV Gaming L.J. 243, 243-245; Silver, *The Curious Case of Convenience Casinos:  How Internet Sweepstakes Cafes Survive in a Gray Area Between Unlawful Gambling and Legitimate Business Promotions* (2012) 29 J. Marshall J. Computer & Info. L. 593, 594-599.)

[2] Unless otherwise indicated, all further statutory references are to the Penal Code.

[3] We ordered defendants' appeals consolidated. Three other related cases (i.e., *People v. Grewal*, case No. F065450, *People v. Walker*, case No. F065451, and *People v. Stidman*, case No. F065689) are addressed by us in a separate, published opinion.

violated the prohibitions against slot machines or gambling devices under section 330b, we affirm the trial court's orders.

## FACTS AND PROCEDURAL BACKGROUND

Defendants operate stores that sell, among other things, "Tel-Connect" and "Inter-Connect" prepaid telephone cards. Nasser's stores do business as "Fun Zone Internet Café[s]," while Elmalih's store does business as "Happy Land." Defendants promote the sale of telephone cards at their stores by offering sweepstakes to their customers. The Tel-Connect and Inter-Connect telephone cards are furnished by Phone-Sweeps, LLC (Phone-Sweeps), a company based near Toronto, Canada. Phone-Sweeps is also the provider of the computer software system that operates defendants' sweepstakes programs, including the computer sweepstakes games (hereafter, the Sweepstakes Gaming System). The Sweepstakes Gaming System is provided to defendants through licensing agreements between defendants and Phone-Sweeps.[4]

When a customer purchases a telephone card or purchases more time on his existing card, he receives 100 sweepstakes points for each dollar spent on prepaid telephone time. Thus, if a customer purchases $20 in telephone time, he would receive 2,000 sweepstakes points with his purchase.[5] Customers may use their points by playing sweepstakes computer games on the terminals provided at defendants' premises. The customers' available telephone time is not reduced by time spent on the terminals playing the computer sweepstakes games. Initially, the way a customer gains access to the

---

[4]     Phone-Sweeps found that the only way it could compete in the telephone card industry was through having its licensee's offer a continuous sweepstakes.

Although the facts and circumstances shown below were *as of* the time of the hearings below, for ease of expression we primarily use the present tense.

[5]     Noncustomers can receive sweepstakes points as well; that is, no purchase is necessary to enter. Persons over the age of 18 who enter defendants' stores can receive 100 free sweepstakes entries or points for that day. Additionally, free points can be received by mailing in a request form.

computer sweepstakes games was to swipe his or her telephone card into an electronic card reader at the computer terminal. More recently, the process followed is that a customer manually enters his or her account number shown on the back of the telephone card at the terminal keyboard.

Once the computer sweepstakes games are displayed, the customer is presented with a number of slot machine style games activated by a touch screen. The customer selects, based on available increments (such as 25, 50 or 100), how many points to use at one time. The customer either loses the points played, or is awarded additional points (called "winning points"), which the system tracks and displays on the screen. If the customer ends up with a positive number of winning points, they are redeemable at $1 per 100 points at the register. For example, 2,400 winning points would result in a cash prize of $24. According to an odds table, within each pool of entries there are entry results that range from $0.01 to $4,200 (based on redeemable points won).[6]

The Sweepstakes Gaming System used to operate defendants' sweepstakes program and computer sweepstakes games is an integrated system that forms a network of computers and servers. The main Phone-Sweeps server is located in Canada and is electronically connected to the servers in defendants' places of business. The server used in each place of business is, in turn, electronically connected to each of the numerous computer terminals that the customers use at that place of business to play the computer sweepstakes games.

Each sweepstakes consists of a finite pool or batch of entries. Depending on the size of the retail store, the number of entries in a sweepstakes pool may be as high as 65 million. The pools are created by Phone-Sweeps main server in Canada. The main server randomizes the entries in each pool, puts them into a set sequential order, and then

---

[6]     If a customer does not wish to play the sweepstakes games, he or she may ask the cashier to do a "Quick Redeem" at the register to reveal a result at the time.

delivers the pool in that sequential order to the "Point of Sale" computer (or server) in defendants' stores. There is nothing defendants or their customers can do to change the sequence or contents (i.e., results) of the entries. Phone-Sweeps main server can detect when the pool in any particular store is nearing the end, and it then creates a new pool, in the same manner, and delivers it to the Point of Sale computer (or server).

When customers play the computer sweepstakes games, they are simply receiving and obtaining the results of the next available entry or entries, in sequence. Thus, the outcomes are predetermined solely by the sequential entries, not by how the customers play the games. The customer cannot impact the result that is determined by the next available entry. Additionally, neither defendants' servers (i.e., the Point of Sale computers) nor the terminals where the computer sweepstakes games are played contain a random number generator or any other way to randomize or alter the sequence of the entry results.

As to the telephone cards (or prepaid telephone time) purchased by customers, defendants provided the trial court with a declaration to the effect that over a one-year period, 31 to 32 percent of the total telephone time sold by Phone-Sweeps through its licensees (such as defendants) was actually used.

The cases against defendants were commenced in May and June 2012 by the Kern County District Attorney's Office on behalf of the People, filed as separate civil actions. Each complaint sought injunctive relief under Business and Professions Code section 17200 based on defendants' alleged violations of antigambling provisions of the Penal Code in the operation of their respective Internet café businesses. The Penal Code provisions at issue under the pleadings were those relating to unlawful lotteries (§ 319) and unlawful slot machines or gambling devices (§§ 330a, 330b & 330.1). A hearing was held in the trial court on the question of whether the court should issue preliminary injunctions as requested by the People, with both cases heard together. The evidence consisted of the parties' moving and opposing declarations along with oral testimony

5.

presented at the hearing. The oral testimony was that of defendants' experts, including Julius Kiss, owner of Phone-Sweeps, and Nicola Farley, an expert in the gaming industry who personally examined defendants' Sweepstakes Gaming System as it operated in conjunction with Phone-Sweeps's main server. Following the hearing, the trial court granted the People's motions for preliminary injunctions. Defendants' appeals followed, which we ordered consolidated.

## DISCUSSION

### I.     The Issue in the Trial Court and Our Standard of Review

The decision to grant a preliminary injunction rests in the sound discretion of the trial court. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69.) Ordinarily, "two interrelated factors" are evaluated by the trial court in deciding whether to exercise its discretion to issue a preliminary injunction: "The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." (*Id*. at pp. 69-70.)[7] An order granting or denying such interlocutory relief reflects the trial court's evaluation of the controversy on the record before it at the time of its ruling; thus, "it is not an adjudication of the ultimate merits of the dispute." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109.) In view of that latter principle, we base our opinion on the state of the record that was before the trial court in granting interlocutory relief, and although on *those* initial facts we reach certain conclusions, we leave open the possibility that a

---

[7]     Where, as here, a governmental entity seeks specifically provided injunctive relief to prohibit an alleged violation of a statute, once that governmental entity makes a showing that it is likely to prevail at trial, a rebuttable presumption arises that the potential harm to the public outweighs the potential harm to the defendant. (*IT Corp. v. County of Imperial*, *supra*, 35 Cal.3d. at pp. 71-72; see Bus. & Prof. Code, §§ 17203 [providing for injunctive relief against unlawful business practices], 17202 [includes specific or preventive relief to enforce penal law].)

trial on the merits based on a more fully developed factual record may cast these matters in a different light.

We review an order granting a preliminary injunction under the abuse of discretion standard. (*People ex rel. Gallo v. Acuna*, *supra*, 14 Cal.4th at p. 1109.) If the evidence is in conflict, we interpret the facts in the light most favorable to the prevailing party. (*Cinquegrani v. Department of Motor Vehicles* (2008) 163 Cal.App.4th 741, 746.) To the extent that the grant of a preliminary injunction was based on statutory construction, we review the issue of statutory construction de novo. (*Ibid*.) The question of whether, under a given state of facts, a particular device is an unlawful slot machine is one of law. (*Trinkle v. California State Lottery* (2003) 105 Cal.App.4th 1401, 1405 (*Trinkle II*.) We review that question of law de novo.

In the instant appeal, defendants contend that the trial court erred or abused its discretion in issuing the preliminary injunctions because, allegedly, there was no likelihood that the People would be able to prevail on the merits. We proceed on this understanding of defendants' claims. (See *Tosi v. County of Fresno* (2008) 161 Cal.App.4th 799, 803-804.)

## II. Statutory Construction of Penal Code Sections

Because our review of the trial court's rulings requires that we interpret or apply certain Penal Code provisions on the record before us, we briefly set forth the relevant principles of statutory construction.

"'[T]he objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] To determine legislative intent, we turn first to the words of the statute, giving them their usual and ordinary meaning. [Citations.] When the language of a statute is clear, we need go no further.'" (*People v. Beaver* (2010) 186 Cal.App.4th 107, 117.) When the language is susceptible of more than one reasonable interpretation, however, we look to extrinsic aids, including the objects to be achieved, the evils to be remedied, the legislative history, public policy, and the statutory scheme of

7.

which the statute is a part. (*Ibid*.; accord, *People v. Woodhead* (1987) 43 Cal.3d 1002, 1008.)

Under the rule of lenity, which defendants argue should be applied here, any doubts as to the meaning of a criminal statute are ordinarily resolved in a defendant's favor. (See, e.g., *People v. Overstreet* (1986) 42 Cal.3d 891, 896; *Walsh v. Dept. Alcoholic Bev. Control* (1963) 59 Cal.2d 757, 764-765).[8] However, that rule of statutory interpretation is only applied where the statute is reasonably susceptible of two constructions that are in relative equipoise—that is, resolution of the statute's ambiguity in a convincing manner is impracticable. (*People v. Lee* (2003) 31 Cal.4th 613, 627; *People v. Avery*, *supra*, 27 Cal.4th at p. 58; *People v. Jones* (1988) 46 Cal.3d 585, 599.) "Thus, although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent." (*People v. Avery*, *supra*, at p. 58 [citing § 4].)[9] As recently stated by our Supreme Court, "'[t]he rule of lenity does not apply every time there are two or more reasonable interpretations of a penal statute. [Citation.] Rather, the rule applies "'only if the court can do no more than guess what the legislative body intended; there must be an *egregious* ambiguity and uncertainty to justify invoking the rule.'"' [Citation.]' [Citation.]" (*People v. Nuckles* (2013) 56 Cal.4th 601, 611.)

---

[8] The rule is sometimes also described as a principle of strict construction. (See, e.g., *People v. Overstreet*, *supra*, 42 Cal.3d at p. 896; *People v. Avery* (2002) 27 Cal.4th 49, 58.)

[9] Section 4 provides: "The rule of the common law, that penal statutes are to be strictly construed, has no application to this code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."

No such ambiguity exists in this case, as will become apparent in the discussion that follows and, therefore, the rule of lenity does not apply.[10]

### III. An Unlawful Slot Machine or Device Was Shown by the Record

We begin with the issue of whether the devices in question (i.e., defendants' Sweepstakes Gaming System operating the computer sweepstakes games on the networked terminals provided to customers) are unlawful slot machines or gambling devices under the applicable penal statutes.

Sections 330a, 330b and 330.1 contain distinct but overlapping provisions that prohibit "slot machine[s] or device[s]" as defined in each section.[11] The definitional language in each section is similar, but not identical. (Cf. §§ 330a, subd. (a), 330b, subd. (d) & 330.1, subd. (f).)[12] Arguably the broadest of the three is section 330b, which defines a "'slot machine or device'" in the following terms: "[A] machine, apparatus, or device that is adapted … for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other

---

**10** Even assuming a strict construction, however, that would not require the statutory wording to be strained or distorted to exclude conduct clearly intended to be within its scope, where the words are given their fair meaning in accord with the evident intent of the Legislature. (*Trinkle v. Stroh* (1997) 60 Cal.App.4th 771, 783 [so holding, construing provision relating to slot machines]; *People v. Shira* (1976) 62 Cal.App.3d 442, 460 [same, construing statute relating to lotteries]; cf. § 4 [penal provisions construed according to their fair import].)

**11** Section 330a was enacted in 1911, while sections 330b and 330.1 were both enacted in 1950. (Stats. 1911, ch. 483, § 1, p. 951 [re: § 330a]; Stats. 1950, 1st Ex. Sess., ch. 17, § 1, p. 452 [re: § 330b]; Stats. 1950, 1st Ex. Sess., ch. 18, § 1, p. 454 [re: § 330.1].)

**12** Our courts have recognized the three provisions are "similar" in their terms (e.g., *Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 593), but also have differences (e.g., *People ex rel. Lockyer v. Pacific Gaming Technologies* (2000) 82 Cal.App.4th 699, 703, fn. 6; but see *Trinkle II*, *supra*, 105 Cal.App.4th at pp. 1409-1410 [treating §§ 330b & 330.1 as identical]).

outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money … or thing of value .…"  (§ 330b, subd. (d).)[13] The People center its discussion on section 330b; we will do the same.

California courts have found section 330b to prohibit a variety of devices where prizes may be won based on chance.  In *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th 699, a vending machine that dispensed telephone cards for $1 included a sweepstakes feature with audio-video displays resembling a slot machine.  When customers purchased a phone card for $1, they were given a chance to win a cash prize of up to $100.  A "preset computer program" determined the results of the sweepstakes; the user could not control or alter the results.  (*Id*. at pp. 701-702.)  The Court of Appeal held the vending machine was a prohibited slot machine under the plain language of section 330b, because "[b]y the insertion of money and purely by chance (without any skill whatsoever), the user may receive or become entitled to receive money."  (*Id*. at p. 703.)  Similarly, in *Trinkle v. Stroh*, *supra*, 60 Cal.App.4th 771, a jukebox that dispensed four songs for $1 was found to be a prohibited slot machine or device under section 330b because the operators also received a chance to win a cash

---

**13**    Section 330.1, subdivision (f), defines a "slot machine or device" in relevant part as "one that is, or may be, used or operated in such a way that, as a result of the insertion of any piece of money or coin or other object the machine or device is caused to operate or may be operated or played, mechanically, electrically, automatically, or manually, and by reason of any element of hazard or chance, the user may receive or become entitled to receive anything of value .…"

Section 330a, subdivision (a), prohibits "any slot or card machine, contrivance, appliance or mechanical device, upon the result of action of which money or other valuable thing is staked or hazarded, and which is operated, or played, by placing or depositing therein any coins, checks, slugs, balls, or other articles or device, or in any other manner and by means whereof, or as a result of the operation of which any merchandise, money … or any other thing of value, is won or lost, or taken from or obtained from the machine, when the result of action or operation of the machine, contrivance, appliance, or mechanical device is dependent upon hazard or chance .…"

jackpot.  (*Id*. at pp. 776-780; see also *Score Family Fun Center, Inc. v. County of San Diego* (1990) 225 Cal.App.3d 1217, 1221-1223 [holding that an arcade video game that simulated card games violated § 330b because operators could, as a matter of chance, win free games or extended play].)

Based on these authorities, the People argue that an unlawful slot machine or device under section 330b is involved in each of defendants' businesses at issue in this consolidated appeal.  According to the People, this conclusion follows from the facts that, under defendants' Sweepstakes Gaming Systems as operated on their computer networks and terminals, upon the payment of money (i.e., the purchase of telephone cards or Internet time), patrons can activate computer sweepstakes games on the terminals and, based on "chance" or "other outcome of operation unpredictable by" the patron, win cash prizes.  We agree with that analysis.  That is, on the question of whether it was appropriate for the trial court to grant the preliminary injunctions, we conclude that the record below was adequate to show the People would likely prevail on the merits under section 330b.

We explain our conclusion by examining each of the statutory elements of an unlawful "'slot machine or device'" under section 330b.  Before we begin that task, a brief comment is needed concerning our approach.  One Court of Appeal decision provided the following distillation of the three elements necessary to constitute a slot machine or device under section 330b:  "(1) the insertion of money or other object which causes the machine to operate, (2) the operation of the machine is unpredictable and governed by chance, and (3) by reason of the chance operation of the machine, the user may become entitled to receive a thing of value."  (*Trinkle II*, *supra*, 105 Cal.App.4th at p. 1410).)  We take issue with this formulation because section 330b, subdivision (d), refers to *chance* "or*" unpredictable* outcome, while *Trinkle II* uses the conjunctive "and" in its articulation of the second element.  As noted in *Score Family Fun Center v. County of San Diego*, *supra*, 225 Cal.App.3d, at page 1221, those terms are clearly in the

disjunctive. As a result, this element of the statute (commonly referred to as the chance element) can be satisfied by showing that a prize may be won by reason of an "outcome of operation *unpredictable*" to the user (§ 330b, subd. (d), italics added; *Score Family Fun Center v. County of San Diego, supra*, at p. 1221). No further or additional proof relating to "chance" is needed.[14] Additionally, we disagree with *Trinkle II's* description of the manner in which the chance element must be realized in order to constitute a slot machine or device under section 330b. Specifically, *Trinkle II* held that the chance element must be created by a randomizing process occurring at the moment the machine or device is being played. (*Trinkle II*, *supra*, at p. 1411.) As will be explained below, we think that holding was in error. Since we disagree with *Trinkle II* on these significant matters relating to the statutory elements, we adopt a different approach here than what was articulated in that case.

In light of the foregoing, and in view of the complexities of the present case, we believe it is best to frame our discussion of the elements of section 330b in terms that are closely tethered to the language of the statute itself. We now turn to those statutory elements as revealed in the statutory language.

The first element specified in the statute is that "*as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated ….*" (§ 330b, subd. (d), italics added.) Defendants

---

**14** The disjunctive statutory wording does not mean that chance and unpredictability are entirely separable, but only that they may be distinguished in terms of what must be shown. Obviously, when the outcome of operation of a device is entirely unpredictable to the user, it is *also* involving chance, since for purposes of our gambling laws "'[c]hance'" means that "winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill." (*Hotel Employees & Restaurant Employees Internat. Union v. Davis*, *supra*, 21 Cal.4th at p. 592.) Here, we believe the statute is simply making clear that it is *sufficient* to establish this element of an unlawful slot machine or device if a prize may be won by reason of an "outcome of operation unpredictable by [the user]." (§ 330b, subd. (d).)

argue that this element is lacking because no coin or similar object was inserted into a slot by customers at the computer terminal to cause the sweepstakes computer games to operate. We reject that argument. Here, the insertion of an account number or the swiping of a magnetic card at the computer terminal in order to activate or access the sweepstakes games and thereby use points received upon paying money at the register (ostensibly to purchase a product) plainly came within the broad scope of the statute. The statute expressly includes the catchall phrase "*by any other means.*" (§ 330b, subd. (d), italics added.) Even though a coin, money or object (e.g., a token) was not inserted into a slot, the games were commenced *by other means* analogous thereto which effectively accomplished the same result and, therefore, this element is satisfied.

The second element of a "slot machine or device" articulated in section 330b is that "*by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any ... money ... or thing of value ....*" (§ 330b, subd. (d), italics added.)[15] This language describes the so-called "chance" element—that is, the requirement that any potential to win a prize must be based on hazard, chance or other outcome of operation unpredictable to the user of the machine or device.

Here, it is clear that defendants' customers may become entitled to win prizes under the Sweepstakes Gaming Systems implementing defendants' computer sweepstakes games based on "hazard or chance or of other outcome of operation unpredictable" to the user. (§ 330b, subd. (d).) That is, we agree with the People that the

---

**15** Prior to 2004, this portion of the statute was worded as follows: "'by reason of any element of hazard or chance or of other outcome of *such* operation unpredictable by him ....'" (*Trinkle II*, *supra*, 105 Cal.App.4th at p. 1409, fn. 6, italics added.) In 2004, as a result of housekeeping legislation that made technical, nonsubstantive changes to numerous statutes, the word "such" appearing before the word "operation" was removed from section 330b. (Stats. 2003, ch. 264, § 1.)

chance element is satisfied. Under California gambling law, "'[c]hance'" means that "winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill." (*Hotel Employees & Restaurant Employees Internat. Union v. Davis*, *supra*, 21 Cal.4th at p. 592.) Since customers playing defendants' computer sweepstakes games can exert no influence over the outcome of their sweepstakes entries by means of skill, judgment or how well they play the game, it follows that we are dealing with systems that are based on chance or luck. Moreover, by describing their promotional giveaways as *sweepstakes*, defendants have effectively admitted to the chance element because a "'[s]weepstakes'" is, by definition, "any procedure for the distribution of anything of value by lot or by chance that is not unlawful under other provisions of law…." (Bus. & Prof. Code, § 17539.5, subd. (a)(12).)[16] Our conclusion is further supported by the official rules and printed materials regarding defendants' sweepstakes, which refer to odds or chances of winning and reiterate that the manner of playing the game does not alter the outcome of an entry.

(A) We Follow *People ex rel. Lockyer v. Pacific Gaming Technologies*

Moreover, even though all sweepstakes entries were previously arranged in batches (or pools) that had *predetermined* sequences, that fact does not change our opinion of this issue (i.e., the chance element) because the results would still be unpredictable and random from the perspective of the user. Section 330b, subdivision (d), refers to chance "*or* of other outcome of operation *unpredictable by him*

---

[16] The difference between a lawful sweepstakes and an unlawful lottery is that a sweepstakes does not require that consideration be paid to enter. (See § 319 [elements of lottery include consideration]; *California Gasoline Retailers v. Regal Petroleum Corp.* (1958) 50 Cal.2d 844, 861-862 [promotional sweepstakes was not an unlawful lottery since consideration element was absent where no purchase necessary to enter].)

*or her ….*" (Italics added.)[17]  The situation here is clearly analogous to what was described in *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th 699, where "[a] preset computer program determine[d] the results of the sweepstakes." (*Id*. at p. 702.)  The machine or device in that case (a "VendaTel" that distributed a telephone card to each customer while entering them in a chance to win a prize) had a "'10 percent payout structure'" where it would "pay[] out $500 in prizes for every $5,000 paid into the machine" with "'predetermined winners' spread out over a period of time." (*Id*. at p. 702, fn. 4.)  Under those facts, the Court of Appeal held that the users of the device became entitled to receive cash prizes "*purely by chance* (without any skill whatsoever)." (*Id*. at p. 703, italics added.)[18]  The same is true here.  On the record before the trial court, the Sweepstakes Gaming Systems and networked terminals were integrated systems or devices through which patrons win cash prizes based upon "hazard or chance or of other outcome of operation unpredictable by [the patron]" in violation of section 330b, subdivision (d).[19]

---

[17]  In the words of an out-of-state case addressing this same issue, "'[w]hat the machine "knows" does not affect the player's gamble.'" (*Moore v. Miss. Gaming Com'n* (2011) 64 So.3d 537, 541.)

[18]  As the Court of Appeal remarked later in that same case, "if it isn't chance, what is it that determines whether the customer wins $100 for his $1?" (*People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th at p. 707.)

[19]  If that were not the case, then even a casino-style slot machine would be legal as long as it was operated by a software system that had previously programmed the sequence of entry results in a fixed order.  A customer inserting money and pulling the handle would receive the outcome assigned to the next available entry result in sequence.  Such a computer program might conceivably include millions of discrete entry results in a predetermined sequence.  A customer using that device would be surprised to learn that merely because there is a preset sequence, he is not playing a game of chance.  Of course, in reality, that is exactly what he is doing.  As aptly remarked in *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th at page 701, "if it looks like a duck, walks like a duck, and sounds like a duck, it is a duck." (Fn. omitted.)

Finally, whether viewed as a third element or an aspect of the second, the statute requires that "*by reason of*" the chance element, a prize or thing of value may be won. (§ 330b, subd. (d), italics added.) Here, it is clear that defendants' customers may become entitled to receive a thing of value (i.e., cash prizes in varying amounts) by reason of the "chance" or "unpredictable" operation of defendants' Sweepstakes Gaming Systems. (*Ibid.*)

(B)     We Distinguish *Trinkle II*

In *Trinkle II*, the Court of Appeal reached the unsurprising conclusion that a vending machine that simply dispenses California State Lottery tickets in the sequential order that they were loaded into the machine is not an unlawful slot machine. However, certain statements made by the Court of Appeal in reaching that conclusion are specifically relied on by defendants herein. In explaining why the element of chance was not present, *Trinkle II* observed: "If a player purchases his ticket from a [Scratcher's vending machine, or SVM], the player obtains the ticket by inserting money into the machine and pushing a button, which releases the next ticket in sequence, according to the order in which it was printed and loaded into the SVM bin. Nothing about the machine or its operation by the customer alters the order in which the tickets were arranged at the time they were printed." (*Trinkle II*, *supra*, 105 Cal.App.4th at p. 1411.) The court further observed that "SVM's do not have computer programs that generate random numbers or symbols, nor do they have any capability of conducting a process of random selection or other kind of chance selection." (*Id.* at pp. 1411-1412.) Since the only element of chance was due to "the printing of the winning tickets and the placement of those tickets in a predetermined sequence" at the time the tickets were manufactured, the SVM itself had no role in outcomes because no further element of chance was involved in connection with the operation or play of the machine. (*Id.* at p. 1412.) In other words, *Trinkle II* explained that unless the element of chance is generated by the machines themselves at the time the customer plays or operates it (like the spinning

16.

wheels of the original mechanical slot machines or a computer program that randomizes the entries), it is only a vending machine.

Defendants insist that their systems are on par with the vending machines in *Trinkle II*, since customers playing defendants' computer sweepstakes games merely receive the next available entry result from a stack that is in a previously arranged, sequential order. We disagree.

For at least two reasons, we hold that *Trinkle II* does not salvage the devices at issue in the present appeal. First, we disagree that the chance element must *always* be generated by some randomizing action of the device itself when it is being played. Section 330b only requires that prizes may be won "by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her .…" (§ 330b, subd. (d).) Under this broad wording, if the entries are arranged in a particular order beforehand, rather than rearranged each time the game is played, it will still suffice. Either way, the next sequential entry/result that is dealt out by the software system will be, from the perspective of the player, by "chance or of other outcome of operation unpredictable by him or her .…"[20] (*Ibid.*)

Second, *Trinkle II* is distinguishable factually because, in the words of a recent federal district court decision, it involved a passive vending machine that "simply delivered a finished product—the lottery ticket." (*Lucky Bob's Internet Café, LLC v. California Dept. of Justice, et al*. (S.D.Cal. 2013) 2013 U.S. Dist. Lexis 62470, p. *8 (*Lucky Bob's*).) Here, in contrast, all the trappings and experiences involved in playing traditional slot machines are actualized in one form or another by defendants' Sweepstakes Gaming Systems and networked computer terminals, since in each case

---

[20] To use an analogy, whether a deck of cards was shuffled the day before, or at the moment the player sits down at the table and places a bet, it is still a matter of chance whether the ace of spades is the next card dealt.

points are received upon making a purchase, a game program is activated by the customer at a terminal, points are used or bet in selected increments, audio-visual scenes are played out on the screen to create the feel and anticipation of a slot machine or other gambling game, and prizes are won. For these reasons, the integrated systems or devices in our case are in a different category than the vending machines in *Trinkle II*. The mere fact that winnings are based on a predetermined sequence of entry results that were delivered into defendants' Sweepstakes Gaming System by an outside server, rather than on a randomly spinning wheel (or the like), does not change the nature and character of devices herein, which as integrated systems function as slot machines.[21]

As should be apparent from the above analysis, we are treating each defendant's complex of networked terminals, software gaming programs and computer servers as a single, integrated system. Under section 330b, subdivision (d), an unlawful "'slot machine or device'" is not limited to an isolated or stand-alone piece of physical hardware, but broadly includes "a machine, *apparatus*, or device that is *adapted*" for use as a slot machine or device. (Italics added.) As defined in dictionaries, the ordinary meaning for the term "apparatus" includes "a group or combination of instruments, machinery, tools, or materials having a particular function" (Random House Webster's College Dict. (1992) p. 66), as well as "[t]he totality of means by which a designated function is performed or a specific task executed" (Webster's II New College Dict. (2001) p. 54). Here, each defendant's system of gaming software, servers and computer

---

[21] In *Lucky Bob's*, the district court correctly focused on all the components of an integrated system functioning together in that case: "Plaintiff's operating system can be distinguished from the vending machine in *Trinkle* by the integrative nature of its components. Here, the sweepstakes winnings necessarily involved the 'value added' of each component of Plaintiff's integrative system—from the computers that read the magnetic strip card; the database server controlling the games; and the point of sale computer that allowed the employee to create the accounts, add Internet time and sweepstakes entries and play out redeemed entries." (*Lucky Bob's*, *supra*, 2013 U.S. Dist. Lexis 62470 at pp. *8-9.)

terminals plainly operated together as a single apparatus. (§ 330b, subd. (d).) While it is true that the end terminals or computer monitors used by patrons—if considered in isolation—may not intrinsically or standing alone contain all the elements of a slot machine, in each case they are part of an integrated system or apparatus wherein the various parts or components work together so as to operate in a manner that *does* constitute an unlawful slot machine or device.

(C)     Other Issues

We briefly address two remaining issues. Defendants suggest that the devices in question cannot qualify as slot machines or devices under section 330b due to a lack of an adequate showing of consideration. We find the argument unpersuasive. Unlike section 319 (regarding lotteries), section 330b does not directly specify that consideration is an element. Therefore, it would seem that as long as the express statutory elements of section 330b are satisfied, no separate showing of consideration is needed. In other words, to the extent that consideration is a factor under section 330b, it is simply subsumed by the existing statutory elements. Since those elements were shown here, nothing more was required. (*Trinkle v. Stroh*, *supra*, 60 Cal.App.4th at pp. 780-781.) Other cases have essentially followed this approach by concluding that even if consideration is necessary in slot machine cases, its existence will be found where a connection exists between purchasing a product from a vending machine or device and being given chances to win a prize. (*Id*. at pp. 781-782; *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, 82 Cal.App.4th at pp. 705-706.) "'Once the element[s] of chance [and prize]'" are added to a vending machine or device, it is reasonable to assume that "'people are no longer paying just for the product regardless of the value given that product by the vender.'" (*Trinkle v. Stroh*, *supra*, at p. 782; accord, *People ex rel. Lockyer v. Pacific Gaming Technologies*, *supra*, at pp. 704-707.) That is the case here as well, since points are given to play the computer sweepstakes games on defendants' terminals based on dollars spent in purchasing products—that is, the elements of chance

19.

and prize are added to the purchase. Additionally, to the extent that defendants are raising the issue of consideration by analogy to the cases addressing lotteries (e.g., *California Gasoline Retailers v. Regal Petroleum Corp.*, *supra*, 50 Cal.2d at pp. 851-862 [consideration element of § 319 lacking where no purchase necessary to enter]), that argument likewise fails because "lottery cases (which are governed by § 319) are not controlling on the issue of illegal slot machines," since they are separate things under the law. (*Trinkle v. Stroh*, *supra*, at p. 781.)[22]

Finally, defendants argue their integrated systems cannot be slot machines on the ground that they are not house-banked games in which the owner has an interest or stake in the outcome. (See *Trinkle II*, *supra*, 105 Cal.App.4th at p. 1412 [so indicating].) We disagree with the premise that only a house-banked game may constitute an unlawful slot machine or device. Section 330 forbids persons from playing or conducting any "banking … game played with cards, dice, or any device." Sections 330a, 330b and 330.1 *separately* prohibit slot machines or devices, as defined therein. No mention is made in the latter statutes of any requirement that the slot machine or device be a house-banked game. We are constrained to follow the explicit definition of an unlawful slot machine or device provided in the applicable statutory language, which is broad enough to include defendants' devices whether or not they are house-banked.[23] (*Hotel Employees & Restaurant Employees Internat. Union v. Davis*, *supra*, 21 Cal.4th at pp. 593-594 [noting broad scope of slot machine statutes].)

---

[22] Additionally, we note that section 330b, subdivision (d), explicitly states that a device meeting the statutory criteria set forth therein constitutes an unlawful slot machine or device "irrespective" of whether a product is also sold by that same machine or device. (See also § 330.1, subd. (f) [same wording].)

[23] To put it another way, we decline to insert a new element into section 330b (that the device be house-banked) that the Legislature did not put there.

We conclude on the record before us that the People are likely to prevail on the merits of their claims that the particular devices at issue are unlawful "slot machine[s] or device[s]" under section 330b.  Accordingly, we affirm the trial court's orders granting preliminary injunctions.  Because the foregoing analysis provides sufficient grounds to affirm the trial court's orders, it is unnecessary to address the additional issue raised by the parties of whether or not the sweepstakes programs may also have constituted unlawful lotteries under section 319.

## DISPOSITION

The orders of the trial court are affirmed.  Costs on appeal are awarded to the People.


_____
Kane, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Franson, J.

21.